Filed 8/23/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>HUMBERTO MIRANDA, ET AL.,<br><br>  Defendants and Appellants. | 2d Crim. Nos. B257245, B258930<br>(Super. Ct. No. PA062376)<br>(Los Angeles County) |

This case involves a razor-blade-shank attack by "Southside" gang members on a Los Angeles County jail inmate who refused to stab another inmate at the gang's behest. Humberto Miranda, Felix Vega, and Isaac Rangel appeal from the judgment entered after a jury trial. All were convicted of assault with a deadly weapon (count 1 - Pen. Code, § 245, subd. (a)(1));[1] assault by means of force likely to produce great bodily injury (count 2 - § 245, former subd. (a)(1), now subd. (a)(4)); and battery with serious bodily injury (count 3 - § 243, subd. (d)). Codefendant Chris DeLeon was acquitted. As to each appellant, the jury found true great bodily injury allegations (§ 12022.7, subd. (a)) and gang enhancements (§ 186.22, subds. (b)(1)(A) & (C)). As to Miranda, the jury found true an allegation that, in the commission of battery with serious

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

[1] All statutory references are to the Penal Code unless otherwise stated.

bodily injury, he had personally used a "knife and razor." (§ 12022, subd. (b)(1).) Vega and Rangel admitted prior felony convictions.

Miranda was sentenced to prison for 17 years, to be served first before the service of life sentences in another case. (See § 669.) Vega was sentenced to prison for 11 years, 4 months, to be served consecutively to a prior sentence in another case of 37 years, 4 months. The aggregate term for both cases was 48 years, 8 months. Rangel was sentenced to prison for 7 years, 4 months, to be served consecutively to a prior sentence in another case of 25 years. The aggregate term for both cases was 32 years, four months.

Appellants argue that the evidence is insufficient to support the gang enhancements. In addition, they argue that the trial court erroneously (1) denied their *Wheeler-Batson* motions, (2) instructed the jury during jury selection, and (3) excluded evidence of the guilty pleas of three codefendants. Vega claims that the trial court erroneously limited his closing argument to the jury. Finally, Vega and Rangel contend that the trial court erroneously sentenced them and failed to calculate the custody credits to which they are entitled. Only the final contention has merit. Miranda makes no claim of sentencing error, but his sentence is also erroneous. We vacate appellants' convictions on count 2 and reverse their sentences on counts 1 and 3. We remand the matter with directions to resentence them and calculate Vega's and Rangel's custody credits. In all other respects, we affirm.

*Facts*

Appellants and DeLeon were members of different Southern California local criminal street gangs. Estuardo Tobias, the victim, claimed that he was not a gang member. In June 2008 Tobias, appellants, and DeLeon were inmates in Dorm 816 at the North County Correctional Facility (NCCF) of the Los Angeles County Jail. The dorm housed approximately 65 inmates, all of whom were Hispanic.

In the presence of Miranda, Rangel, and DeLeon, Vega ordered Tobias to cut another inmate with a knife. Tobias refused. Vega replied, "'All right. If you don't do it, you got that coming.'" Later that same day, Vega told Tobias that someone wanted

2

to speak to him upstairs.  Tobias understood that he was going to see "Puppet," "the gang member who was running the jail."  According to Tobias, "Puppet was the one who would give orders about who should get beat up and what should happen among the gang members . . . ."

After Tobias walked upstairs, Vega started fighting with him and "tried to take [him] down on the ground."  Miranda, Rangel, DeLeon, and "not less than another five [persons]" ran toward Tobias.  The other persons included gang members Edgar Centeno, Skary Paredes, and Ivan Toscano.

Appellants cut Tobias with razor blades attached to toothbrushes.  Tobias was punched and kicked.  "There were blows, but there were so many of them [that Tobias] couldn't tell . . . who did what."  Someone said, "'Cut him, but make sure that you're getting him on the neck.'"  "The last thing [Tobias] remember[ed] was that someone said, 'Hide.  They're coming.'"

Sheriff's deputies arrived and stopped the fight.  A deputy testified that he "saw five people attacking one person."  The deputy subsequently testified:  "There could have been more."  "[I]t looked like there was approximately five or more."  Another deputy testified that he "saw approximately five inmates" surrounding Tobias and "punching him repeatedly in a violent manner."  "It could have been more, but I'm pretty certain that it was at minimum five."  Neither deputy saw the beginning of the fight.

Tobias was "drenched in blood."  Blood was "squirting from his wrist onto the walls."  He had "six or seven different injuries."

Appellants had blood on their clothing and bodies.  The DNA profile of blood found on Vega and Rangel matched the DNA profile of Tobias's blood.

[[*Wheeler-Batson Motions*

Appellants contend that the trial court erroneously denied their *Wheeler-Batson* motions.  (*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler* ); *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] (*Batson* ).)  The motions were based on the prosecutor's use of peremptory challenges to strike four prospective jurors because of their race.

"The applicable law is well settled. '[Under *Wheeler*,] [a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article 1, section 16 of the state Constitution. [Citations.] [Under *Batson*,] [s]uch a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]'" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1104, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"When a defendant claims a prosecutor has challenged a prospective juror based on an impermissible ground, the following procedures apply: 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."' [Citation.]" (*People v. Hensley* (2014) 59 Cal.4th 788, 802.)

*Standard of Review*

The trial court found that appellants had made a prima facie showing of purposeful discrimination as to the four prospective jurors in question. We assume, without deciding, that the court's finding was correct. We review only its subsequent finding that the prosecutor made an adequate showing of the absence of purposeful discrimination.

"'"'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and

4

reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.'"" [Citation.] 'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.' [Citation.]" (*People v. Hensley*, *supra*, 59 Cal.4th at pp. 802-803.) We will uphold the trial court's ruling if "[s]ubstantial evidence supports [its] determination that the prosecutor's reasons for challenging [the prospective jurors] were honestly stated and race neutral." (*Id.*, at p. 805.)

### *Juror No. 7655*

Juror No. 7655, an African-American, was a church pastor. He had conducted funerals for victims of gang violence and had "ministered" to at least one gang member. He had "some knowledge" as to why young men join gangs. He believed that the system of justice works "sometimes."

The prosecutor declared that he had struck juror no. 7655 because the juror had said that the criminal justice system works only "sometimes." In addition, the prosecutor did not like "pastors, men of faith, because their job involves forgiveness far more so than judgment, and I find that it can be very difficult for them [to convict]."

"[S]ubstantial evidence supports the trial court's decision that the prosecutor's reasons for excusing the pastor were legitimate and race-neutral. The pastor is in the business of forgiveness . . . ." (*People v. Semien* (2008) 162 Cal.App.4th 701, 708.) Furthermore, by stating that the criminal justice system works only "sometimes," the pastor conveyed a distrust of that system. "A prospective juror's distrust of the criminal justice system is a race-neutral basis for his excusal. [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 907.)

### *Juror No. 0268*

Juror no. 0268 was also African-American. Since 1998, she had lived near the University of Southern California and had noticed gang activity in the neighborhood. She was close to a cousin who was a gang member and had "been in . . . trouble with the law." It is not clear whether, at the time of jury selection, the cousin was a former or active gang member. The juror said: "One of my relatives is a [gang] member. Well, he

5

used to be. I don't know now." When the prosecutor asked whether she had tried to "distance" herself from her cousin's gang activities, she replied: "What you mean, 'distance myself from it'? I'm not around him like that, you know."

The prosecutor declared that he had struck juror no. 0268 because "she [had] a close family member who was a gang member" and lived in a neighborhood where gang activity occurred. The prosecutor further stated: "I didn't like the fact that she's wearing a hat in court and during court proceedings. I noticed she wore a hat yesterday and today during the entire proceedings and she did not remove it. And I didn't personally love her overall demeanor. I felt she had a strong personality that could cause overall dissension amongst the jury."

In denying appellants' *Wheeler-Batson* motion, the trial court explained: "I don't think the hat is a dramatic issue, and so I wouldn't normally accept that, but it's the other context: that she had a relationship with a gang member, her cousin. And I also agree with [the prosecutor], that she was a really strong personality, and those are race neutral reasons to excuse somebody."

Substantial evidence supports the trial court's acceptance of the prosecutor's race-neutral reasons for striking juror no. 0268. "'[N]othing in *Wheeler* disallows reliance on the prospective jurors' . . . manner of answering questions as a basis for rebutting a prima facie case' of exclusion for group bias. [Citation.]" (*People v. Reynoso* (2003) 31 Cal.4th 903, 917.) "'Obviously, we cannot, on the cold record, verify the prosecutor's . . . stated reason [i.e., "overall demeanor" and "strong personality"] for challenging [juror no. 0268]. This is, of course, one reason why appellate courts in this area of law generally give great deference to the trial court, which saw and heard the entire voir dire proceedings.' [Citation.]" (*Id.*, at pp. 917-918, fn. omitted.) In any event, the jurors' closeness to her gang-member cousin is by itself a sufficient race-neutral reason for the peremptory challenge.

*Juror No. 8885*

Juror no. 8885, of Hispanic origin, initially said she was a "community mental health *social worker*." (Italics added.) She later said she was a "community

6

health specialist." She had visited three persons either in court or in jail. The persons were "a friend, a relative, and an ex-boyfriend." She had gone to court for the relative and had seen him in jail. She believed that the relative had been fairly treated.

Juror No. 8885 had "mixed feelings" about gangs. When the jury was asked if anyone had "positive feelings when you hear the name 'gang member,'" she responded, "some people don't have families and so [gang membership is] a way for them to have a family."

The prosecutor said that he had struck juror no 8885 because she was a "social worker" and social workers "are dismissed . . . by the D.A. in almost every case." Furthermore, "[s]he indicated that gangs are positive in the case, or at least can be at times. She indicated a number of friends, family, and relatives who have been arrested for crimes. She said they were treated fairly, but there were a number of them. All of those things are red flags . . . ."

The court ruled: "I'm going to find that the prosecutor has offered race-neutral reasons. I totally agree with him." Substantial evidence supports the court's ruling.

*Juror No. 8338*

Juror no. 8338 was also of Hispanic origin. She "had friends that were gang members." One of her close friends was a former member of a Hispanic gang. He "had tattoos that he's trying to cover up." She assured the court that she "can be fair." The gang issue would not "affect [her] impartiality."

The prosecutor said that he had struck juror no. 8338 for two reasons. First, "she did indicate the close friend who was the gang member. I felt that that would sway her attitude." Second, "as the rest of [the] panel has bonded together while they sit in the box, she did not speak to anyone else. She looks away from the other jurors. I have a primary concern having a hung jury, and I didn't feel comfortable with her based on that performance."

The trial court responded, "I don't know whether she was or was not bonding with the jury." "I didn't see any of that." But the court "accept[ed] [that] the

7

reasons given were race neutral." It noted that the prosecutor had left six Hispanics on the jury. "That does not suggest that he's just knocking off Hispanics."

"Substantial evidence supports the trial court's determination that the prosecutor's reasons for challenging [juror no. 8885] were honestly stated and race neutral." (*People v. Hensley*, *supra*, 59 Cal.4th at p. 805.) The juror's close friendship with a former gang member was alone sufficient to support the court's ruling. Even if the prosecutor's "bonding" explanation were without foundation, "this fact . . . [would] not undermine the 'genuineness'—or the sufficiency—of the other 'neutral explanation[].'" (*People v. Alvarez* (1996) 14 Cal.4th 155, 198.) The prosecutor's acceptance of six Hispanic jurors indicates that his peremptory challenge of juror no. 8885 was not racially motivated. (See *People v. Huggins* (2006) 38 Cal.4th 175, 236 ["We also note that the prosecutor accepted three African–American jurors, which we find here to be 'an indication of the prosecution's good faith in exercising his peremptories'"].)

*Comparative Juror Analysis*

In arguing that the trial court erroneously denied their *Wheeler-Batson* motions, appellants undertake comparative juror analysis. They compare the four prospective jurors who were peremptorily challenged to other jurors who were allowed to remain on the jury. Our Supreme Court has "held that 'evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by defendant and the record is adequate to permit the urged comparisons.' [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 658.)

"[C]omparative juror analysis on a cold appellate record has inherent limitations. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 622.) "This is true because '[o]n appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. "Even an inflection in the voice can make a difference in the meaning."' [Citation.]" (*People v. Chism* (2014) 58 Cal.4th 1266, 1318.)

8

"Our review of the record taken as a whole demonstrates that substantial evidence supports the trial court's finding that the prosecutor's peremptory excusal[s] of [the four prospective jurors] were not motivated by discriminatory intent. [Citation.] [Appellants'] reliance on comparative juror analysis does not undermine this conclusion. We find that [their] *Batson–Wheeler* motion[s] [were] properly rejected below." (*People v. Cruz*, *supra*, 44 Cal.4th at p. 661.)

### *Appellants Forfeited Their Claim that the Trial Court*
### *Gave Erroneous Instructions during Jury Selection*

Appellants argue that, during jury selection, the trial court gave erroneous instructions on the reasonable doubt standard and the presumption of innocence. Appellants contend, "[I]t is immaterial that the judge gave accurate model instructions at the close of evidence."

The allegedly erroneous instructions are threefold. First, the trial court said: "[T]here are no [percentage] numbers," such as "96 percent, 88 percent, 77" percent, "that describe beyond a reasonable doubt. . . . [S]o forget the numbers . . . . [The reasonable doubt standard is] much, much higher than the civil standard. It's the highest standard we have." Second, when a juror said he assumed that appellants were innocent, the trial court replied: "[Y]ou are not to assume anything about [appellants]. You are to wait for the evidence to come forward."[2] Third, upon sustaining the prosecutor's objection to defense counsel's assertion that "the prosecution must prove each fact beyond a reasonable doubt," the trial court told the jury: "They have to prove elements of a crime. Circumstances, although they have to do that, it's trickier than you're making it out to be. It's more complicated."

The trial court's statements were not formal instructions on the law. Instead, they were comments on legal issues. Because appellants did not object to these

_____

[2] Later on during jury selection, the trial court told the jury that appellants are "presumed to be innocent as we start the case and actually throughout the case. That presumption only changes if and when the People are able to prove them guilty beyond a reasonable doubt."

9

comments, their claim of error is forfeited. *People v. Seumanu* (2015) 61 Cal.4th 1293, is on point. There, the defendant asserted for the first time on appeal that during voir dire the trial court had "injected ambiguity into the trial" by his comments about a particular jury instruction. (*Id.*, at p. 1357.) Our Supreme Court "conclude[d] the issue was not preserved for appeal by a timely and specific objection to the trial court's comments. [Citation.]" (*Ibid.*) The Supreme Court explained: "Although defendant relies on [Evidence Code] section 1259 to excuse his failure to object, the argument cannot be sustained. That statute permits a defendant to raise on appeal a claim challenging 'any instruction . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby.' Defendant is not, however, challenging the correctness of a jury instruction . . . . [H]is claim is one of judicial error, not misinstruction of the jury, and that claim is subject to the requirement that a defendant make a timely and specific objection in order to preserve the issue for appeal." (*Ibid.*)

In any event, if the trial court's comments were erroneous, the error was harmless. "'[A]s a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. . . .' Because the . . . jury was later properly instructed with the standard . . . instructions, we find that even if error occurred, it was not reasonably possible it affected the . . . verdict. [Citation.]" (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1358; see also *People v. Pearson* (2013) 56 Cal.4th 393, 414 [assuming that trial court's comments to prospective jurors during jury selection were erroneous, the error was harmless because the comments "were not the full instructions regarding the jury's deliberative process," the full instructions "came only after the evidence portion of trial," and "[w]e presume that jurors understand and follow the court's instructions"].)]]

*Sufficiency of the Evidence to Support the Gang Enhancements*

Appellants contend that the evidence is insufficient to support the criminal street gang enhancements. The People were required to prove that the crimes for which appellants were convicted had been "committed for the benefit of, at the direction of, or

10

in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)

*Standard of Review*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

*Gang Evidence*

Deputy Francis Hardiman testified for the People as a gang expert. He had qualified "about 60 times" in Los Angeles County Superior Court as an expert on the Mexican Mafia or the Southside criminal street gang. The following summary of the gang evidence is primarily based on his testimony.

Appellants and DeLeon were members of both Southside and different Southern California Hispanic local criminal street gangs. Other inmates who participated in the assault upon Tobias - Edgar Centeno, Skary Paredes, and Ivan Toscano - were also gang members. Centeno was a member of the Pasadena Latin Kings gang and Southside,

11

Paredes was a member of Southside, and Toscano was a member of the North Side Longos' gang and Southside.[3]

Dorm 816, where the inmates were housed, was "a Southside dorm." An inmate was assigned there only if he had identified himself as a Southsider or jail officials had "designated [him as a] possible Southsider."

Southside was created by the Mexican Mafia in the early 1990s. The Mexican Mafia is a Hispanic prison gang. It and a rival Hispanic prison gang, Nuestra Familia, agreed to divide California into two territories. Hispanic gang members south of Delano are considered to be "Southsiders." Hispanic gang members north of Delano are considered to be "Nortenos." Southsiders owe their allegiance to the Mexican Mafia, while Nortenos owe their allegiance to Nuestra Familia.

If you are a Southern California Hispanic gang member, "[w]hen you come in from the street into [Los Angeles County jail], your gang rivalries out on the street end, and you are a member of the Southside" criminal street gang. When Tobias arrived at Dorm 816, Vega told him that, "since they were working for the South, there was no fighting among them."

A Southern California Hispanic gang member who did not want to be a Southsider always had the option of informing jail authorities that he "can't do this anymore." The gang member would then "become a protective custody inmate." Southsiders have an obligation to attack protective custody inmates if the opportunity arises.

A Mexican Mafia member in the Los Angeles County jail "is in control of all of the Southsiders within the . . . jail." He is at the top of "a pyramid-like structure of leadership within the jail that controls the actions of the individual Southsiders." The Los Angeles County jail is divided into seven facilities, and a "Southsider shot caller . . . is in

---

[3] Centeno, Paredes, and Toscano were appellants' codefendants. They pleaded guilty before trial. In the unpublished portion of this opinion, we reject appellants' contention that the trial court erroneously refused their request to take judicial notice, in the jury's presence, of the guilty pleas.

charge" of each facility. "The next step down from the facility shot caller [is] the floor shot caller." Each floor is divided into modules or dorms, and each module or dorm has a Southside shot caller. If a Southsider wants to use violence against an inmate, he generally must get permission "from the various shot callers above [him]."

Every week, each dorm shot caller collects "taxes" from the Southsiders in his dorm. The taxes are forwarded to the Mexican Mafia. "So each dorm each week . . . generate[s] income" for the Mexican Mafia.

A set of rules called "the Southside rules" applies to all Southsiders in jail. "The rules are designed to strictly control violence by the Southside[rs]." "[E]ach individual member of the Southside is expected to keep an eye on the other members and help enforce those rules." Hardiman gave several examples of the Southside rules.

Any Hispanic from Southern California, regardless of whether he is a gang member, who "comes into the jail . . . falls under the control of the Southside. And they have to follow the [Southside] rules." "Paisa," "Resident," and "Christian" are "designation[s] by the Southside of a person who is not a member of the Southside but has to follow the rules." When Tobias arrived at Dorm 816, Vega informed him of the rules.

Vega testified that in June 2008, when the incident involving Tobias occurred, he was the "bar man" for Dorm 816. Deputy Hardiman defined "bar man" as "a person within the Southside who is designated to be a contact point in a dorm with the staff of the facility." The bar man also "communicates with the hierarchy of the Southside." The bar man sometimes "give[s] out the orders about who gets beat up, who gets kicked . . . ."

Raymond Cuevas worked for Hardiman as an informant. His gang moniker was "Puppet." When Vega told Tobias that someone wanted to speak to him upstairs, Tobias understood that he was going to see "Puppet," "who would give orders about who should get beat up and what should happen among the gang members . . . ." Hardiman testified that in about August 2009 Cuevas became "the shot caller for the entire

13

facility . . . ." Cuevas said that "Vega had status within the Southside and eventually became the shot caller for the entire facility . . . ." Deputy Christian Lopez, who worked at NCCF and had frequent contact with Vega, testified that Vega had "worked his way up from bar man" to "facility shot caller, for a short period of time" between October and December 2009.

Deputy Hardiman saw "roll call lists," which were generated by Southside and listed its members as well as inmates under its control. Vega's, Miranda's, and DeLeon's names were on the lists. Rangel "appear[ed] on roll calls with [his] name, booking number, and moniker ["Evil"] and [local street] gang."

The prosecutor asked Deputy Hardiman a hypothetical question incorporating the facts of the assault committed upon Tobias. Deputy Hardiman opined that the assault "was committed at the direction of, for the benefit [of], and in association with a criminal street gang, to wit, the Southside." Hardiman explained that the assault benefited Southside because "it tells both other Southsiders, people that aren't Southsiders but fall under the control of the Southside, and the other groups within the jail -- like the black inmates, the white inmates . . . -- that the Southside is . . . so strong and so committed that they're willing to attack their own because their own in this instance wouldn't follow their rules." This creates fear and intimidation among other inmates and "causes [Hispanic inmates] to follow the rules." The fear and intimidation deter "other organizations from trying to influence or stick their nose into the interests of the Southside, such as extortion, money laundering, drug dealing."

Vega testified that he was a member of a gang called Pacoima Project Boys, not a gang called Southside. "Sureno" or "Southside" means "like saying you're from Southern California." Vega claimed that Tobias had said he was a member of the Langdon Street gang in the San Fernando Valley.

Rangel testified that he was a member of a gang called Compton Varrio Tres. He identified himself as a "Sureno," which means a "gang member from the south" of California.

14

DeLeon testified that, when he "was younger," he had been a member of a gang called La Mirada Locos. But DeLeon told Vega that he was a current member of the La Mirada gang. Vega heard other inmates address DeLeon by his gang moniker, "Capone." DeLeon testified that "Southsiders" means "Hispanic from down south." He was asked, "Does everyone who is Hispanic who is a member of a gang south of Delano, a member of Southside?" DeLeon replied, "Only when you're in jail."

Miranda did not testify. Deputy Hardiman opined that Miranda had "a leadership rol[e] within [the] San Fer" criminal street gang in the San Fernando Valley. Miranda told Vega that he was from San Fer.

*Expert Gang Testimony*

Miranda and Rangel assert that the evidence is insufficient to support the gang enhancements because Deputy Hardiman's "conclusions were spun out of whole cloth" and "are not worthy of any assignment of value or credibility." They allege that his "conclusions are based upon matters which are not reasonably relied upon by other experts, and upon factors which are speculative, remote or conjectural." (Bold and capitalization omitted.)

Miranda and Rangel impugn Deputy Hardiman's gang expertise. They claim that he "concluded South Side was a criminal street gang, upon his arrival at the Los Angeles County Sheriff's Department, without any prior gang experience or training." They also impugn his motives, accusing him of going over the head of his superior, Sergeant Meade, to "OSJ leader[,] Gregory Thompson, soon to be indicted on corruption then occurring at the jail, to test the waters and in so doing, to advance up the ladder."[4] They attempt to tarnish Hardiman's character by linking him with Thompson: "This self[-]made expert climbed up the ladder after 7 months at OSJ with the blessings of its leader at a time when the FBI was investigating corruption at the jail which led to conviction of its OSJ leader."

---

[4] "OSJ" is an abbreviation for Operation Safe Jails, "an intelligence-gathering unit within the Los Angeles County jail system."

15

For four reasons, we reject Miranda's and Rangel's allegations concerning Deputy Hardiman's testimony. First, they are not supported by meaningful analysis with record citations to evidence before the jury. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Second, by not objecting to Hardiman's qualifications as a gang expert, Miranda and Rangel forfeited this issue. (*People v. Bolin* (1998) 18 Cal.4th 297, 321.) Third, Hardiman's credibility was a matter for the jury to decide, and it impliedly found him to be credible. "'"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" . . . .' [Citation.]" (*People v. Barnes* (1986) 42 Cal.3d 284, 306.)

Fourth, Hardiman's "conclusions were [not] spun out of whole cloth." Nor were they based on speculation. Hardiman listened to a recorded "face-to-face conversation" between Miranda and two other inmates "about the conduct and operations of the Southside." Miranda had a "'thirst for blood' tattoo," which is "an earned tattoo within the Southside." Hardiman's opinion that Vega was a member of Southside was based on "his actions, his conduct," his tattoos, "admissions that he made to Deputy Christian Lopez," and Hardiman's conversations with the informant Raymond Cuevas. Hardiman conversed with Cuevas "at least 30 times." In addition to having been the Southside "shot caller for the entire facility," Cuevas was also "a crew chief for a member of the Mexican Mafia." Hardiman was familiar with the "Southside rules" in force at NCCF. He saw "hundreds" of Southside "roll call lists," some of which included appellants' and DeLeon's names. He spoke to "hundreds of Southsiders" and to several members of the Mexican Mafia, plus more than 100 "dropouts" from the Mexican Mafia and Southside. He listened to "hundreds of hours of recorded conversations . . . between Southsiders talking to other Southsiders and . . . sometimes members of the Mexican Mafia about their criminal enterprise." He spoke to police officers who were working in an undercover capacity within the Mexican Mafia or Southside.

16

Hardiman's conclusions are supported by Tobias's and codefendant DeLeon's testimony. When Tobias arrived at Dorm 816, Vega told him that "they were working for the South" and explained the rules to him. DeLeon testified that Southern California Hispanic local gang members are members of Southside "[o]nly when [they are] in jail."

Hardiman's conclusions are also supported by the nature of the attack upon Tobias. The attack involved concerted, apparently preplanned action by members of different local street gangs against an inmate who had refused to follow the command of a Southside "shot caller."

Appellants argue that the Los Angeles County Sheriff's Department's "classification system created a gang it called South Sider making membership mandatory" for "any Hispanic geographically from southern California regardless of whether or not he was a gang member before incarceration . . . ." This constituted "an unlawful classification system which was based on ethnicity." "In the context of whether a finding is supported by substantial evidence, opinion evidence based on ethnic discrimination is not reasonable, credible, and of solid value."

Appellants' argument is not supported by the evidence. Hardiman testified that, upon entry into the Los Angeles County jail, only Southern California Hispanic gang members become members of Southside. Incarcerated Southern California Hispanics who are not gang members are not members of Southside, although they "fall[] under [its] control." "[Y]ou really don't have to be a member of a street gang to be subject to the power [Southside] hold[s] over you . . . ."

The Sheriff's Department did not create Southside. Southside was created by the Mexican Mafia. Hardiman testified: "[T]he Sheriff's Department doesn't designate anybody as a Southsider. That's for the Southside and for the individual."

*Elements of Statutory Definition of a Criminal Street Gang*

Vega and Rangel claim that the evidence is insufficient to establish the elements of the statutory definition of a criminal street gang. "'[C]riminal street gang' means any ongoing organization, association, or group of three or more persons, whether

formal or informal, having as one of its primary activities the commission of one or more of [statutorily enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

*Common Name or Common Identifying Symbol*

Vega and Rangel assert that "Southside did not have its own unique symbolism. Rather, it used the same iconic Mayan imagery and the number 13 used by the Mexican Mafia." But the gang statute does not require "unique" symbolism. It requires only a "common identifying sign or symbol." (§ 186.22, subd. (f).) Furthermore, the statute provides that a criminal street gang must have "a common name *or* common identifying . . . symbol," not both. (§ 186.22, subd. (f), italics added.) Either is sufficient. Deputy Hardiman testified that the Southside gang had a common name: the terms "Sureno, Sur, Southside, [and] Southsider" were all "synonymous" with the gang. "Sur" is Spanish for "south," and "Sureno" is Spanish for "a person who is from the south." Southside also had a "common identifying . . . symbol." (*Ibid.*) It had "a symbol called the Kampol, . . . which is two horizontal lines with three dots above the horizontal lines which is a Mayan representation of the number 13." The thirteenth letter of the alphabet is "M," which stands for the Mexican Mafia. Hardiman's testimony constitutes substantial evidence of "a common name or common identifying . . . symbol." (*People v. Gardeley* (1996) 14 Cal.4th 605, 620 [gang expert's testimony was sufficient to satisfy most of the elements of definition of a criminal street gang, including that the gang "shares 'a common name or common identifying . . . symbol'"].)

*Primary Activities*

Vega and Rangel maintain that the evidence is insufficient to show that "one of [Southside's] primary activities" was "the commission of one or more" of the "criminal acts" enumerated in the gang statute. (§ 186.22, subd. (f).) Deputy Hardiman testified that the "most common" activities of Southside were "extortion, drug dealing, assault with deadly weapons, [and] conspiracies to [commit] murder." These activities are among the criminal acts enumerated in the statute. (§ 186.22, subds. (e)(1), (3), (4),

18

(19).)  Deputy Hardiman's testimony constitutes substantial evidence of the "primary activities" element of the definition of a criminal street gang.  (*People v. Prunty* (2015) 62 Cal.4th 59, 82 [gang expert's testimony "that 'the Nortenos' in the area engage in various criminal practices" was "likely sufficient" to establish "primary activities" element]; *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324; *People v. Gardeley*, *supra*, 14 Cal.4th at p. 620.)

*Pattern of Criminal Gang Activity*

Finally, Vega and Rangel allege that the evidence is insufficient to show that Southside "members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (§ 186.22, subd. (f).)  The prosecution has "the choice of proving the requisite 'pattern of criminal gang activity' by evidence of 'two or more' predicate offenses committed 'on separate occasions' *or* by evidence of such offenses committed 'by two or more persons' on the same occasion."  (*People v. Loeun* (1997) 17 Cal.4th 1, 10.)  The prosecution may "rely on evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member."  (*Ibid*.)

The People contend that the predicate offenses were sufficiently proved by Hardiman's testimony that two other named individuals had been convicted of assault with a deadly weapon and murder and had committed these crimes while they were members of Southside, although they were also members of different local criminal street gangs.  Hardiman was the investigating officer in the assault with a deadly weapon case and testified at the trial in the murder case.  The People also contend that the predicate offenses requirement was proved by all of the appellants' contemporaneous commission of the charged offenses.  (See *People v. Loeun*, *supra*, 17 Cal.4th at p. 14 ["Through evidence of defendant's commission of the charged crime of assault with a deadly weapon on Ivan Corral and the separate assault on Corral seconds later by a fellow gang member, the prosecution established the requisite 'pattern of criminal gang activity'"].)

But appellants argue that the evidence is insufficient to show that they and the two other named individuals belonged to the same "umbrella" Southside gang.  "[I]t

19

is axiomatic that those who commit the predicate acts must belong to the same gang that the defendant acts to benefit." (*People v. Prunty*, *supra*, 62 Cal.4th at p. 76.)  Where, as here, "the prosecution's case positing the existence of a single 'criminal street gang' [Southside] for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets [the different local street gangs at NCCF]**,** then the prosecution must show some associational or organizational connection uniting those subsets.  That connection may take the form of evidence of collaboration or organization . . . .  Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together." (*Id.*, at p. 71.)  The associational or organizational connection may be "formal or informal." (*Id.*, at p. 74.)  The People acknowledge that the different Southern California Hispanic local criminal street gangs at NCCF "were subsets of South Side."

"The most straightforward cases [of an associational or organizational connection] might involve subsets connected through formal ways, such as shared bylaws or organizational arrangements.  Evidence could be presented, for instance, that such subsets are part of a loose approximation of a hierarchy.  Even if the gang subsets do not have a formal relationship or interact with one another . . . the subsets may still be part of the same organization if they are controlled by the same locus or hub.  For example, Norteño gang subsets may be treated as a single organization if each subset contains a 'shot caller' who 'answer[s] to a higher authority' in the Norteño chain of command. [Citations.]" (*People v. Prunty*, *supra*, 62 Cal.4th at p. 77.)

The evidence here shows that this is one of "[t]he most straightforward cases" of an associational or organizational connection. (*People v. Prunty*, *supra*, 62 Cal.4th at p. 77.)  The Southern California Hispanic gang subsets at NCCF were "controlled by the same locus or hub." (*Ibid.*)  Deputy Hardiman described in detail the "pyramid-like structure of leadership within the jail that controls the actions of the individual Southsiders," with a Mexican Mafia member at the top and Southside shot-callers at different levels of the pyramid.  The subset gang members were governed by "a set of rules" called "the Southside rules."  "[P]roof that different Norteño subsets are

governed by the same 'bylaws' may suggest that they function . . . within a single hierarchical gang. [Citation.]" (*Ibid*.)

In proving the requisite associational or organizational connection, prosecutors may "show that members of the various subsets collaborate to accomplish shared goals." (*People v. Prunty*, *supra*, 62 Cal.4th at p. 78.) The prosecutor in the instant case made such a showing. When Tobias arrived at Dorm 816, Vega told him that, "since they were working for the South, there was no fighting among them." Prosecutors may establish collaboration by showing "that members of different subsets have 'work[ed] in concert to commit a crime,' [citation] . . . ." (*Id*., at p. 78, fn. omitted.) Here, the evidence shows that members of different gang subsets worked in concert to commit the aggravated assault upon Tobias. The subsets were "united by their activities." (*Id*., at p. 75.)

Accordingly, "'"viewing the evidence in the light most favorable to the People"'" and "presum[ing] in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27), we conclude that a reasonable trier of fact could have found beyond a reasonable doubt "that those who commit[ted] the predicate acts . . . belong[ed] to the same gang that [appellants] act[ed] to benefit." (*People v. Prunty*, *supra*, 62 Cal.4th at p. 76.)

[[*The Trial Court Did Not Erroneously Exclude*

*Evidence of the Guilty Pleas of Appellants' Codefendants*

Four defendants - appellants and DeLeon - were on trial before the jury. Without objection, the trial court informed the jury that seven defendants were present at the preliminary hearing. Three codefendants - Edgar Centeno, Skary Paredes, and Ivan Toscano - pleaded guilty before the trial began. Appellants maintain that the trial court erroneously denied their request to take judicial notice, in the jury's presence, of the codefendants' guilty pleas. Appellants told the trial court that the two deputies who witnessed the fight had testified that five persons assaulted Tobias, so "it would be

21

unfair . . . not to bring in the fact that these three other people had admitted to the participation in the attack." The implication was that if only five persons were involved in the attack and three had pleaded guilty, then only two of the four defendants on trial could be guilty.

The trial court did not err in denying the request for judicial notice. Only relevant evidence is admissible (Evid. Code, § 350), and the codefendants' guilty pleas were irrelevant. "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) The codefendants' guilty pleas proved only that they had admitted assaulting Tobias or aiding and abetting the assault. The pleas had no tendency in reason to prove or disprove that appellants had participated in the assault. "[A] guilty plea or conviction of a participant is irrelevant to whether another person was positively and correctly identified as a coparticipant, and merely invites the inference of guilt by association. [Citation.]" (*People v. Neely* (2009) 176 Cal.App.4th 787, 795.)

We recognize that "it is always proper to defend against criminal charges by showing that a third person, and not the defendant, committed the crime charged." (*People v. Hall* (1986) 41 Cal.3d 826, 832.) But the guilty pleas of the three codefendants did not have a tendency in reason to prove that they, in lieu of appellants, had committed the charged assault. Tobias testified that no fewer than nine inmates had assaulted him. The deputies, who did not see the beginning of the attack, testified that they had observed "approximately five or more" and "at minimum five" inmates assaulting Tobias. The DNA profile of blood on Rangel's clothing and body matched his own and Tobias's blood. The DNA profile of blood taken from Vega's shirt and chin matched Tobias's blood. Miranda had "a deep cut on one of his fingers." Bloodstains from his pants matched his own DNA profile.

Even if the guilty pleas were relevant evidence, the trial court did not err in excluding the evidence because its minimal probative value was substantially outweighed by the probability that its admission would cause undue prejudice to codefendant DeLeon, who was on trial with appellants. (Evid. Code, § 352.) DeLeon objected to the

22

request for judicial notice. We assume that his objection was based on the reasonable concern that the guilty pleas "invite[] an inference of guilt by association . . . ." (*People v. Leonard* (1983) 34 Cal.3d 183, 188.)

We reject appellants' contention that, instead of granting their request for judicial notice of the codefendants' guilty pleas, the trial court erroneously gave CALJIC No. 2.11.5. "[T]he instruction accurately states the law and does not appear to have been misleading." (*People v. Farmer* (1989) 47 Cal.3d 888, 919, disapproved on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) The instruction provided: "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not speculate or guess as to why the other person is not being prosecuted in this trial or whether he . . . has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of each defendant on trial." We presume that the jury followed this instruction. (*People v. Zavala* (2013) 216 Cal.App.4th 242, 249.)

*The Trial Court Properly Limited*

*Closing Argument by Vega's Counsel*

Vega claims that, during closing argument, the trial court erroneously refused to permit his counsel to comment about the dirty clothes that Tobias, who was in custody, had worn to court. Tobias's dirty clothes allegedly supported Vega's testimony that a fight had broken out between him and Tobias over the latter's slovenly habits. According to Vega, other inmates complained that Tobias was "sloppy." He confronted Tobias and reproached "him about being sloppy and not wanting to clean." Tobias got angry, and they started fighting. Codefendant DeLeon, who had bunked with Tobias, testified that he had asked Tobias to move to another bunk because he would not "clean after himself" and had poor "grooming standards."

During closing argument, Vega's counsel told the jury that it was "brought to his [client's] attention . . . that Estuardo Tobias is [a] filthy dirty nasty guy." Counsel continued, "[E]verywhere he goes people complain because he's dirty. You saw the way

23

he came to court with the filthy undershirts.  He could have changed.  But he chose to come to court with that dirty coffee-stained undershirt."  The prosecutor objected, and the trial court sustained the objection because the argument assumed a fact not in evidence: that Tobias "could have changed" his undershirt.  The trial court instructed the jury to disregard the argument.  It said to counsel in the jury's presence, "Move on to another argument.  This one is a losing one.  Move on to another argument.  Forget about the T-shirt."  Counsel then declared to the jury:  "You saw him in court, you saw the way he came with that shirt.  Just because the judge thinks it's a losing argument, doesn't mean you have to agree with him."

The trial court immediately conducted a sidebar conference.  The prosecutor protested that he had provided street clothes for Tobias, but "the sheriffs did not dress him. . . .  It was not in his control."  The trial court told counsel:  "[Tobias] asked to put him in street clothes, and the sheriffs wouldn't let him."  After the sidebar conference, the court instructed the jury:  "[T]he clothing that Mr. Tobias wore was not in his control. . . .  [S]o you are to forget about the clothing that he was wearing in court.  It is not germane evidence in this case."

Vega argues that, in limiting his counsel's closing argument, the trial court committed reversible error:  "[T]he court's limitation of [counsel's] argument deprived [Vega] of the ability to persuade the jury of a legitimate inference from the evidence that supported his defense to the charge of orchestrating a gang hit on Tobias."  Vega further complains that the court's "derogation of [counsel's argument] as a 'losing one,' borders on judicial misconduct."

We disagree.  Counsel's argument was a "losing one" because she was not entitled to make it.  She assumed a fact not in evidence:  that Tobias had "chosen" to wear a dirty undershirt to court and could have changed into a clean one if he had wanted to do so.  "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] . . . ."  (*People v. Valdez* (2004) 32 Cal.4th 73, 133-134; see also *People v. Mincey* (1992) 2 Cal.4th 408, 442 ["A

24

defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference"].)

*Sentencing of Vega and Rangel and*

*Calculation of their Custody Credits*

Vega and Rangel claim that they were erroneously sentenced on all three counts.

*Count 1*

On count 1, Vega and Rangel were found guilty of assault with a deadly weapon. (§ 245, subd. (a)(1).) The jury found true great bodily injury and gang enhancements. (§§ 12022.7, subd. (a), 186.22, subd. (b)(1)(C).)

Vega admitted one prior "strike" within the meaning of California's Three Strikes law (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)), one prior serious felony conviction within the meaning of section 667, subdivision (a)(1), and one prior prison term within the meaning of section 667.5, subdivision (b). The court sentenced him to two years for the assault with a deadly weapon (one-third the three-year midterm doubled because of the strike), plus one year for the great bodily injury enhancement (one-third of three years), plus three years, four months for the gang enhancement (one-third of 10 years), plus five years for the prior serious felony conviction. The trial court did not impose an enhancement for both the prior serious felony conviction and the prior prison term because they were based on the same offense. (*People v. Jones* (1993) 5 Cal.4th 1142, 1144-1145.) Thus, Vega's total sentence on count 1 was 11 years, 4 months, which was ordered to run consecutively to a previously imposed sentence in another case of 37 years, 4 months.

Rangel admitted one prior strike, one prior serious felony conviction, and two prior prison terms. The trial court sentenced him to one year for the assault with a deadly weapon, doubled because of the strike, plus one year for the great bodily injury enhancement, plus three years, four months for the gang enhancement, plus one year for one of the prior prison terms. Thus, Rangel's total sentence on count 1 was seven years, four months, which was ordered to run consecutively to a previously imposed 25-year

25

sentence in another case. The trial court did not impose an enhancement for the prior serious felony conviction because it had already been imposed in calculating the 25-year sentence. Enhancements for prior felony convictions are "status enhancements" that can be imposed only once on the aggregate sentence. (*People v. Edwards* (2011) 195 Cal.App.4th 1051, 1057.)

We accept the People's concession that the trial court erroneously imposed both the great bodily injury enhancements and the gang enhancements. The gang enhancements were aggravated because Vega and Rangel were convicted of a violent felony as defined in subdivision (c) of section 667.5. (§ 186.22, subd. (b)(1)(C).) They were therefore subject to a 10-year gang enhancement instead of the standard two, three, or four-year enhancement. (§ 186.22, subd. (b)(1)(A) & (C).) The felony was violent only because it had "been charged and proved as provided for in Section 12022.7" that they had inflicted great bodily injury upon Tobias. (§ 667.5, subd. (c)(8).) Thus, "the trial court imposed *two* enhancements for [Vega's and Rangel's] infliction of great bodily injury on the same victim in the commission of a single offense. . . . [T]he trial court should have imposed only the greatest of those enhancements [i.e., the aggravated gang enhancement] as required by section 1170.1, subdivision (g). [Citation.]" (*People v. Gonzalez* (2009) 178 Cal.App.4th 1325, 1332.) "The proper remedy . . . [is] *not* to strike the punishment under section [12022.7] but to reverse the trial court's judgment and remand the matter for resentencing. [Citation.]" (*People v. Rodriguez* (2009) 47 Cal.4th 501, 509.)

### Count 2

On count 2 Vega and Rangel were convicted of assault by means of force likely to produce great bodily injury. (§ 245, former subd. (a)(1), now subd. (a)(4).) The trial court imposed the identical consecutive sentences that it had imposed on count 1. The court stayed the sentences on count 2 pursuant to section 654.

The sentences on count 2 are invalid because in June 2008, when the offense was committed, assault with a deadly weapon, as charged in count 1, and assault by means of force likely to produce great bodily injury, as charged in count 2, were

26

alternative statements of the same offense: a violation of section 245, subdivision (a)(1). In other words, in counts 1 and 2 Vega and Rangel were convicted of committing the same offense in different ways. Accordingly, the conviction on count 2 must be vacated. (See *People v. Ryan* (2006) 138 Cal.App.4th 360, 371.)

*Count 3*

On count 3, Vega and Rangel were convicted of battery with serious bodily injury. (§ 243, subd. (d).) Count 3 alleged a standard gang enhancement under section 186.22, subdivision (b)(1)(A). Count 3 did not allege a great bodily injury enhancement "[b]ecause the 'great bodily injury' contemplated by section 12022.7 is substantially the same as the 'serious bodily injury' element of section 243, subdivision (d) [citation] . . . ." (*People v. Hawkins* (2003) 108 Cal.App.4th 527, 531.) Thus, pursuant to the pleadings, Vega and Rangel were subject to the standard two, three, or four-year term for the gang enhancement. At the time of sentencing, the prosecutor told the court that the gang enhancement "might be mispled" and is "at least a five-year gang enhancement." Nevertheless, the court imposed consecutive sentences of one-third the aggravated 10-year term under section 186.22, subdivision (b)(1)(C). The court stayed the sentences on count 3 pursuant to section 654.

The People concede that the 10-year aggravated gang enhancement does not apply to count 3. They argue that Vega and Rangel are subject to the five-year enhancement of section 186.22, subdivision (b)(1)(B), which applies when the defendant is convicted of a serious felony as defined in section 1192.7, subdivision (c). We agree. Vega's and Rangel's convictions of battery with serious bodily injury qualify as serious felonies under section 1192.7, subdivision (c)(8), which applies to "any felony in which the defendant personally inflicts great bodily injury on any person." (*Ibid*.) Section 1192.7, subdivision (c)(8), unlike section 667.5, subdivision (c)(8), does not require that the infliction of great bodily be "charged and proved as provided for in Section 12022.7."

We recognize that the information specifically pleaded, and the jury found true, that the gang enhancements on count 3 were pursuant to section 186.22, subdivision (b)(1)(A). But "[a] reference to an incorrect penal statute can be overcome by factual

27

allegations adequate to inform the defendant of the crime [or enhancement] charged. [Citations.]" (*People v. Haskin* (1992) 4 Cal.App.4th 1434, 1439.) The great bodily injury allegations in counts 1 and 2 put Vega and Rangel on notice that they were subject to a five-year gang enhancement based on the commission of a serious felony pursuant to section 186.22, subdivision (b)(1)(B) and section 1192.7, subdivision (c)(8). The trial court should have imposed consecutive sentences of one year, eight months (one-third of five years) for the gang enhancements on count 3.

*Prior Serious Felony Conviction*

Vega and Rangel argue that, on each of counts 2 and 3, the trial court erroneously imposed a prior serious felony conviction enhancement pursuant to section 667, subdivision (a)(1). The argument as to count 2 is moot because we are vacating their convictions on that count. We accept the People's concession that, as to count 3, Vega's argument has merit. Enhancements for prior felony convictions can be imposed only once on the aggregate sentence. (*People v. Edwards*, *supra*, 195 Cal.App.4th at p. 1057.) Since the trial court imposed a prior serious felony conviction enhancement on count 1, it could not impose the same enhancement on count 3.

Rangel's argument, on the other hand, is devoid of merit because the trial court did not impose a prior serious felony conviction enhancement on any of the three counts against him.

*Aggregate Sentence*

Vega and Rangel argue that, instead of ordering that the sentence imposed in the instant case shall run consecutively to the sentence imposed in a prior case, the trial court should have imposed a single aggregate sentence for both cases. We agree. Rule 4.452 of the California Rules of Court provides: "If a determinate sentence is imposed under section 1170.1(a) consecutive to one or more determinate sentences imposed previously in the same court or in other courts, the court in the current case must pronounce a single aggregate term, as defined in section 1170.1(a), stating the result of combining the previous and current sentences. In those situations: [¶] (1) The sentences on all determinately sentenced counts in all of the cases on which a sentence was or is

being imposed must be combined as though they were all counts in the current case. [¶] (2) The judge in the current case must make a new determination of which count, in the combined cases, represents the principal term, as defined in section 1170.1(a). [¶] (3) Discretionary decisions of the judges in the previous cases may not be changed by the judge in the current case. Such decisions include the decision to impose one of the three authorized prison terms referred to in section 1170(b), making counts in prior cases concurrent with or consecutive to each other, or the decision that circumstances in mitigation or in the furtherance of justice justified striking the punishment for an enhancement." On remand, the trial court must pronounce a single aggregate term pursuant to rule 4.452.

### Custody Credits

The trial court did not award custody credits to Vega or Rangel because "they're getting credits" in the other cases for which they had previously been sentenced and were currently serving time. The court later declared, "They're not entitled to any credits because it's a consecutive sentence." We accept the People's concession that "because . . . the trial court imposed a single aggregate term for each appellant that included the sentence in the other case, the court was required to calculate the credits appellants had earned against those aggregate terms." Accordingly, on remand the trial court must calculate and award Vega's and Rangel's custody credits and include them in the Abstract of Judgment. (See *People v. Phoenix* (2014) 231 Cal.App.4th 1119, 1129-1130; *People v. Saibu* (2011) 191 Cal.App.4th 1005, 1012-1013.)

### Sentencing of Miranda

Miranda makes no claim of sentencing error. But the trial court made some of the same mistakes that it made in sentencing Vega and Rangel. On count 1, Miranda was sentenced to four years for assault with a deadly weapon, plus three years for the great bodily injury allegation, plus 10 years for the gang enhancement pursuant to section 186.22, subdivision (b)(1)(C). The trial court should have imposed only the 10-year gang enhancement.

29

On count 2 the trial court sentenced Miranda to prison for 17 years, but stayed the sentence pursuant to section 654.  The conviction on count 2 must be vacated.

On count 3, the trial court sentenced Miranda to four years for battery with serious bodily injury, plus 10 years for the gang enhancement, plus one year for the enhancement of using a deadly or dangerous weapon.  (§ 12022, subd. (b)(1).)  The court stayed the sentence pursuant to section 654.  The court should have imposed a five-year gang enhancement instead of the 10-year enhancement.]]

*Disposition*

The convictions on count 2 are vacated and the sentences on counts 1 and 3 are reversed.  The matter is remanded to the trial court with directions to resentence appellants on counts 1 and 3 in accordance with this opinion.  The court shall calculate Vega's and Rangel's custody credits.  In all other respects, the judgments are affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


YEGAN, J.

We concur:


GILBERT, P. J.


PERREN, J.

Stephen A. Marcus, Judge

Superior Court County of Los Angeles

_____


James Crawford, Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant, Humberto Miranda.

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant, Felix Vega.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant, Isaac Rangel.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Roberta L. Davis, Deputy Attorney General, for Plaintiff and Respondent.